## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THU TRAN, Individually And
On Behalf of All Others Similarly Situated,

              Plaintiff,

       vs.

NETLIST, INC., CHUN K. HONG,
CHRISTOPHER LOPES, NAM KI HONG,
THOMAS F. LAGATTA, ALAN H. PORTNOY,
DAVID M. RICKEY, PRESTON ROMM, RBC
CAPITAL MARKETS CORPORATION,
THOMAS WEISEL PARTNERS LLC and JMP
SECURITIES LLC,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. 07 CV 3754

Judge Berman

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

RECEIVED

MAY 11 2007

U.S.D.C. S.D.N.Y.
CASHIERS

**JURY TRIAL DEMANDED**

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of purchasers of the common stock of Netlist,

Inc. ("Netlist" or the "Company") in, or traceable to, the November 30, 2006 Initial Public Offering

("IPO" or the "Offering") of 7.1875 million shares of common stock. In connection with this

Offering – of which 6.25 million shares were sold by the Company, and of which 937,500 shares

were sold by Company insiders – defendants raised gross proceeds of at least $50.3125 million.

1

2.      Netlist, its entire Board of Directors, its Vice-President of Sale and the Underwriters involved in the Offering (including Thomas Weisel Partners, LLC, Needham & Co., LLC and WR Hambrecht + Co.), are each charged with including, or allowing the inclusion of, materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the IPO, in direct violation of the Securities Act of 1933.  Specifically: defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO; each also failed to reveal that, at the time of the IPO, the Company was *already* witnessing the adverse effects of an oversaturated computer memory market; and they were aware or were reckless or negligent in not knowing that Netlist had no strategy in place that would allow it to minimize adverse market conditions in the general chip sector, as defendants had previously stated in road-show presentations to analysts and investors prior to, and media interviews immediately following, the November 2006 IPO.

3.      It was only on April 16, 2007, after the close of trading and after defendants and other Company insiders liquidated over $6.5625 million of their personally held shares in connection with the IPO, that the truth about Netlist was revealed, including that the problems which existed at the time of the IPO would result in extremely disappointing results for the first quarter of 2007.  At that time, defendants admitted that the Company was performing well below guidance, that earnings would be almost 75% lower than previous forecasts, and that expenses were higher than expected.

4.      The following trading day, on the publication of this news, Netlist stock price collapsed.  As evidence of this, shares of Netlist fell almost 30% in a single trading day – falling to approximately $4.29 per share – and amounting to a decline of almost 40% compared to the November 2006 IPO Offering price, and a decline of almost 70% compared to Netlist's trading

period high of more than $12.00 per share.    On April 17, 2007, Netlist also experienced

exceptionally heavy trading volume with over 1.783 million shares traded, which was ten times the

Company's prior-day average daily trading volume.

## JURISDICTION AND VENUE

5.    The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the

"Securities Act").  Jurisdiction is conferred by §22 of the Securities Act.  Venue is proper pursuant

to §22 of the Securities Act, as defendant Netlist and/or the Individual Defendants and Underwriter

Defendants,  Thomas Weisel Partners, Needham & Co. and WR Hambrecht, conduct business in,

and the wrongful conduct took place in, this District.   Moreover, shares of Netlist were ultimately

listed for trading on the NASDAQ Market Exchange, also based in this District.

## THE PARTIES

### Plaintiff

6.    Plaintiff THU TRAN purchased shares of Netlist common stock pursuant to and/or

traceable to the Company's materially false and misleading Registration Statement and Prospectus

issued by defendants in connection with the November 2006 IPO, including those shares detailed in

the Certification, attached and incorporated herein by reference, and was thereby damaged.

### Corporate Defendant

7.    Defendant **NETLIST, INC.** is a Delaware Corporation, founded in 2000, with

headquarters in Irvine, California.  Netlist engages in the design, manufacture, and sale of memory

subsystems for the server, computing, and communications markets in the United States. Its memory subsystems consist of DRAM integrated circuits and other components assembled on a printed circuit board. The Company markets and sells its products to original equipment manufacturers (OEMs) through a direct sales force and a network of independent sales representatives.

8.    The individuals identified as defendants in subparagraphs (a) - (g) below are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the false statements contained in, and omissions from, the materially false and misleading Registration Statement and joint Proxy/Prospectus as alleged herein, as those statements were "group-published" information. The Individual Defendants include:

(a)    Defendant **CHUN K. HONG** ("Hong") was and is President, Chief Executive Officer and Chairman of the Board of Directors of the Company. Defendant Hong signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO. Also in connection with this IPO, defendant Hong sold at least 531,250 shares of his personally-held Netlist shares, realizing **over $3.718 million** in gross proceeds. Prior to the IPO, defendant Hong owned approximately 45.3% of the Company's shares issued and outstanding and, following the offering, continued to own slightly over 28% of Netlist's shares.

(b)    Defendant **CHRISTOPHER LOPES** ("Lopes") was and is Vice President of Sales of the Company. Defendant Lopes aided in the preparation and filing of the Company's materially false and misleading Registration Statement and Prospectus which was filed and issued in connection with the November 2006 IPO. Also, in connection with this IPO defendant Lopes sold **over $656,250** of his privately held Company shares.

4

(c)    Defendant **NAM KI HONG** is and was a member of the Board of Directors of the Company.  Defendant Nam Ki Hong signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO.

(d)    Defendant **THOMAS F. LAGATTA** ("Lagatta") is and was a member of the Board of Directors of Netlist.  Defendant Lagatta signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO.

(e)    Defendant **ALAN H. PORTNOY** ("Portnoy") is and was a member of the Board of Directors of Netlist.  Defendant Portnoy signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO.

(f)    Defendant **DAVID M. RICKEY** ("Rickey") is and was a member of the Board of Directors of Netlist.  Defendant Rickey signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO.

(g)    Defendant **PRESTON ROMM** ("Romm") is and was a member of the Board of Directors of the Company.  Defendant Romm signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the November 2006 IPO.

### IPO Underwriter Defendants

9.     In connection with the November 2006 Initial Public Offering, the following investment banks acted as "Lead Underwriters" of the Offering - - distributing over 7.187 million shares of Netlist stock to investors and initiating the first public market for Netlist shares. Excluding the oversubscription allotment of an additional 927,500 shares sold by Company insiders, the distribution of the Netlist shares awarded Underwriters in the IPO occurred, as follows:

| Name | Number of Shares |
|---|---|
| Thomas Weisel Partners, LLC ("Thomas Weisel") | 3,750,000 |
| Needham & Co., LLC ("Needham") | 1,875,000 |
| WR Hambrecht + Co., LLC ("WR Hambrecht") | 625,000 |
| **Total** | **6,250,000** |

10.     In connection with the November 2006 IPO, the Underwriter Defendants were paid over $3.521 million in gross fees - - paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid a minimum of $0.49 per share in connection with the sale of the 7.1875 million shares, including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | | Total | |
|---|---|---|---|
| | Per Share | Without Over-Allotment | With Over-Allotment |
| Public offering price | $ 7.00 | $ 43,750,000 | $ 50,312,500 |
| Underwriting discount | 0.49 | 3,062,500 | **3,521,875** |
| Proceeds, before expenses, to us | | 40,687,500 | 40,710,365 |
| Proceeds, before expenses, to the selling stockholders | | — | 6,080,260 |

6

11.     Shareholders paid over $3.52 million in combined fees to compensate the Underwriter Defendants for conducting a purportedly significant "due diligence" investigation into Netlist in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the Initial Public Offering, and this was supposed to provide investors with important safeguards and protections.

12.     The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into Netlist sales, accounting, controls, procedures and it also required defendants to test the assumptions and verify the projections adopted or ratified by defendants, to the extent a reasonable investor with access to such confidential corporate information would. A significant due diligence investigation would have extended well beyond a mere casual review of Netlist books and records, and its accounting, financial report, and operational and financial controls. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

13.     In addition, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about Netlist's business, operations, products, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committee-meetings, and reports and other information provided to them in connection with those meetings.

7

14.    In addition to the Underwriting Defendants, it is also appropriate to treat the individuals named as defendants herein as a group for pleading purposes (the "Individual Defendants") and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition. The Individual Defendants were also involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these statements, in violation of the federal securities laws.

15.    As officers and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, traded on the Nasdaq stock market exchange (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and

omissions made in connection with the issuance of common stock in November 2006 violated these specific requirements and obligations.

16.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company at the time of the Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

## MATERIALLY FALSE & MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT AND PROSPECTUS

### Background to the Offering

17.    In preparation for the Company's November 30, 2006 IPO, defendants engaged in a series of presentations to institutional and large individual investors, and hedge fund and money managers (the "road-show presentations"). It has since been reported that, during these pre-Offering meetings, defendant Hong and other members of the Company who attended made the following representations about the Company, its business, and its operations:

* In the six years since its inception, Netlist had emerged as *an established "leader" in the market for "high-performance memory."*

* Netlist had *"strong relationships" with its OEM customers*, including Dell, IBM and Hewlett-Packard. Moreover, because the Company was actually engaged in the design of special, high-end memory products, *Netlist aligned itself with its customers much earlier in the product manufacturing and sales cycle*.

* Netlist utilized a *"highly scalable business model"* and was in the process of diversifying its customer base. As evidence of such purported scalability and customer diversification, the Company reported net income of $3.1 million on revenue of $109 million in the first 9 months of 2006, compared to a loss of $2 million on revenues of $57 million in the year earlier period.

9

\*      Netlist was *"experiencing rapid growth in both revenues and gross margins,"* and the Company had already experienced consistent improvements in its quarterly results for the six consecutive quarters prior to the IPO, and defendants *expected "to continue this growth trend over the next year."*

\*      Netlist *products were distinguishable from "off-the-shelf DRAMs"* that are used to deliver memory for personal computers because they employ proprietary technologies that allow the Company to create *unique products that were in much higher demand than commodity-type memory products,* and that also served to insulate Netlist from general market oversupply events.

18.      The Company's distinction as an IP innovator and a leader in the "high-end' segment of the memory market can not be understated. Due to the commoditized nature of the DRAM market, where products were relatively fungible and competitors battled on price alone, the ability of Netlist to distinguish itself with proprietary products and services was reasonably viewed by investors as a means of avoiding difficult industry conditions, fierce price competition, and adverse cyclical events.

19.      Moreover, the fact that Netlist worked so closely with its customers in developing these custom, high-end applications was also viewed as a competitive advantage because it would provide the Company with better lines of communication to these customers and because it would allow Netlist to better and more accurately forecast and manage earnings, profits, margins, and growth. That the Company's customer base was so concentrated among its top few customers, with Dell and IBM accounting for 38% and 33% of revenues in 2006, was also viewed as simplifying defendants' forecasting.

20.      Thus, following the conclusion of the Company's road-show presentations that occurred in several major-U.S. cities in the weeks and days prior to the IPO, on November 30, 2006,

defendants published a release announcing that Netlist had priced the Initial Public Offering of its

common stock at $7.00 per share. This release stated, in part, the following:

**Netlist, Inc. Prices Initial Public Offering**

Netlist, Inc. (Other OTC:NLST.PK - News) today announced the pricing of the initial
public offering of its common stock. Netlist sold 6,250,000 shares in the offering at a
price of $7.00 per share. Certain selling stockholders have granted the underwriters
the right to purchase up to 937,500 shares of Netlist's common stock from the selling
stockholders at the initial public offering price solely to cover over-allotments.
Netlist's common stock will be listed on the NASDAQ Global Market under the
symbol "NLST."

Thomas Weisel Partners LLC acted as sole bookrunning manager for the offering.
Needham & Company, LLC and WR Hambrecht + Co acted as co-managers. A copy
of the final prospectus relating to the offering may be obtained by contacting Thomas
Weisel Partners LLC by mail at One Montgomery Street, San Francisco, CA 94104,
or by telephone at (415) 364-2720.

21.    When shares of the Company began trading that day, they immediately rallied almost

35%, trading to a high of almost $9.50 per share, before closing the trading day at $8.10 each.

Investors who received these shares, however, did not appear to immediately liquidate them despite

this share price appreciation, and share volume reached just over 215,000 for the day.

22.    By the end of its first trading day, the Company had an initial market capitalization of

almost $137 million. In addition, at $8.00 per share, Netlist also traded at approximately 22 times

annualized earnings, a significant premium to its competitors such as Smart Modular Technologies

Inc., according to *Reuters* news reports estimates. This premium reflected investors' belief that the

Company utilized a proprietary business strategy that allowed it to limit its exposure to ordinary

DRAM market volatility.

23.    In connection with the November 30, 2006 IPO, defendants filed with the SEC the

Registration Statement and joint Proxy / Prospectus (alternatively, the "Registration Statement" and

11

"Prospectus"), pursuant to Form 424B1.[1]  This Prospectus was materially false and misleading and misstated material facts about the Company.  Rather than disclose the Company's true exposure to the general DRAM market, at the time of the Offering the Prospectus described Netlist as a growth company that was executing according to its specialized, niche-market sales and development plans, and was capitalizing on its ability to sell high-end memory products, the demand for which continued at the time of the IPO.  As evidence of this, the Prospectus stated, in part, the following:

> **[Business]**
>
> We design and manufacture high performance memory subsystems. We sell our subsystems to original equipment manufacturers, or OEMs, in the server, high performance computing and communications markets. Within these markets, we target applications in which memory plays a key role in enabling overall system performance. Our memory subsystems are incorporated into multiple platforms at International Business Machines Corporation, or IBM, Dell Inc., Gateway, Inc., Lenovo Group Limited, or Lenovo, and Hewlett-Packard Company.
>
> * * *
>
> ***Our memory subsystems offer differentiated features and performance characteristics.*** For example, our innovative printed circuit board, or PCB, designs enhance signal integrity, allowing our customers to design and market products that operate at the highest commercially available speeds. Another technique we utilize is to embed passive devices within the PCB, thereby freeing valuable board space to reduce form factors and improve signal integrity. Our solutions also address system-level thermal issues encountered at high operating speeds through such innovations as planar designs and proprietary heat dissipation technologies. [Emphasis added.]

24.     In addition, the Prospectus described the Company's purported Growth Strategy, in part, as follows:

> **[Growth Strategy]**
>
> Our objective is to be the leading provider of high performance memory subsystems. Key elements of our strategy include:

---

1 This Prospectus also formed part of the Netlist IPO Registration Statement.

- ***Further Sales Penetration of Existing Customers* .   *We have established deep relationships, and qualified our products, with leading OEMs*.** Our current OEM customers have a large and diverse portfolio of system platforms that require high performance memory subsystems. We believe we have an attractive opportunity to provide them with memory solutions for a greater number of their existing and future platforms.

- *Establish Relationships with New Customers....*

- *Target New Applications and Product Opportunities....*

- *Continue to Invest in the Development of Proprietary Technology...*

- ***Establish International Operations and Manufacturing Capabilities.***   We plan to establish a manufacturing facility in China during the first half of 2007. We believe that this will allow us to better support leading OEMs with design and manufacturing sites in China, lower our production costs and provide access to new pools of engineering talent. [Emphasis added.]

25.    Defendants also distinguished Netlist from its competitors as a result of its unique

products and market leading position.   As further evidence of this, the Prospectus also stated, in part,

the following:

**The Traditional Memory Supply Chain Cannot Deliver High Performance Memory Solutions**

Memory ICs are typically assembled together on a card, or module, before being incorporated into electronic systems. Memory modules save valuable motherboard space in an electronic system, allow for the use of different types and densities of memory in the same system, and facilitate subsequent upgrading of the memory to a different type or density. According to iSuppli, a market research firm, the global DRAM module market was $21.4 billion in 2005, representing 86% of the total DRAM market.

Most DRAM memory modules sold to OEMs have traditionally been produced by the same companies that manufacture DRAM ICs. In an effort to continually reduce costs and achieve higher memory densities, DRAM manufacturers typically operate their own fabrication facilities and use leading edge manufacturing processes, which require multi-billion dollar capital investments. *To maximize capacity utilization and reduce unit costs, DRAM manufacturers have historically focused on the highest volume applications, such as PCs, to recoup their investments. Memory modules used in PCs employ industry standard configurations, are largely*

*commoditized, and require limited systems expertise to develop. Therefore, DRAM manufacturers generally have not focused on developing the systems expertise necessary to produce application-specific memory subsystems that incorporate small form factors, high speed, optimal thermal characteristics and signal integrity.*

DRAM manufacturers have historically attempted to address increased demands for memory in electronic systems by developing new generations of memory ICs with increased density. For example, the density of a 1 gigabyte memory module comprised of eighteen 512 megabit ICs can be doubled to 2 gigabytes by using eighteen 1 gigabit ICs. *This approach of using next-generation ICs, however, can be problematic for OEMs.* When first introduced, next-generation DRAM ICs are only available in limited supply and typically command a premium price on a per-byte basis compared to current-generation DRAM ICs. Next-generation DRAM ICs can sell at prices up to ten times higher than current-generation ICs at introduction, and it may take as long as five years to achieve price parity between the generations. *Thus, the increasing demand for higher density memory solutions exceeds the pace at which memory IC manufacturers are able to cost-effectively produce next-generation memory ICs and reduce the cost of current-generation memory ICs. One approach to addressing the need for high density memories in a more cost-effective manner is the stacking of memory ICs, or chip-stacking.* Chip-stacking is a process in which DRAM ICs are stacked prior to assembly of the memory subsystem. For example, a 4 gigabyte memory module can be made with 36 stacks of two 512 megabit ICs. While it can be less expensive than non-stacked solutions, stacking costs can still constitute a significant portion of the cost of materials for a memory module.

*Other industry dynamics are reducing the DRAM manufacturers' focus on the high density DRAM subsystems market. In an effort to achieve greater diversification and profitability, the largest DRAM manufacturers have dedicated increasing design resources and manufacturing capacity to non-DRAM products such as flash memory and complementary metal oxide semiconductor,* or CMOS, image sensors, further decreasing their desire and ability to supply high performance, application-specific memory subsystems that may sell in relatively low volumes. In addition, an *increasing portion of global DRAM supply is being manufactured by integrated device manufacturers and third party foundries that lack back-end capability beyond wafer fabrication.* In contrast to traditional DRAM manufacturers with fully integrated operations, these companies generally lack the internal packaging and assembly capabilities to produce modules. *The most recently established DRAM manufacturers have focused on commodity-driven, mass-production business models rather than the memory module market.*

**A Need for High Performance Memory Subsystem Suppliers Exists Today**

14

Historically, many OEMs designed and manufactured their memory ICs and subsystems in-house. However, *the increasing complexity of systems, proliferation of different platforms, continuing evolution of industry standards, increasing need for customization and OEM desire to reduce capital investments are driving OEMs to purchase ICs and subsystems from specialized suppliers focused on developing innovative subsystem solutions.* These suppliers require extensive systems expertise to engage with the OEM customer throughout the product development cycle to produce a highly differentiated memory solution that addresses the issues and constraints specific to a particular high-end system. *Since industry-standard products are inadequate, these solution providers must employ innovative technologies, such as efficient planar design, alternative packaging techniques and custom semiconductor logic design capabilities, to develop memory subsystems customized for OEMs' specific systems*. OEMs also require these suppliers to meet a number of additional criteria beyond innovation, such as low cost, rapid time-to-market and high product quality. [Emphasis added.]

26.     To execute this purported Growth Strategy, defendants described the Company's

business model and operations "Solution," in part, as follows:

**Our Solution**

*We provide high performance memory subsystems to the server, high performance computing and communications markets.* We utilize our innovative and proprietary technology, as well as our extensive systems expertise, to bridge the gap between industry standard approaches and the requirements of complex OEM systems. Our application-specific solutions provide customers with the following key benefits:

*Highly Differentiated Memory Solutions Through Deep Customer Engagement. We work closely with our OEM customers, from the earliest stages of new product definition through the ramp up to mass production, to develop and deliver application-specific memory subsystems which address the full range of system architecture and performance requirements. Our close, collaborative relationships with our OEM customers give us early insight both into their current needs and into future technology trends*. In addition, our in-depth systems expertise, coupled with our ability to customize solutions, enables our OEM customers to offer differentiated products that feature high levels of performance while improving reliability and, in some cases, reducing cost.

*High Performance Through Proprietary Technologies and Design Techniques.* We have developed *a portfolio of proprietary technologies and design techniques to achieve optimal electronic signal strength and integrity, high memory density and improved heat dissipation....* Our solutions also address the system-level thermal

15

issues encountered at high operating speeds via such innovations as planar designs and proprietary heat dissipation technologies that allow us to minimize heat concentrations within the system.

*    *    *

*Rapid Order Fulfillment Capability.* **We operate our manufacturing facility in a manner that maximizes our ability to meet changing customer demand. Our turn-around times are typically one week or less, and in some cases as few as two days**, which allows us to match unforeseen customer demand and to provide our OEM customers with timely access to products.

*Cost-Effective Memory Solutions.* We provide high performance memory subsystems at what we believe to be the ***lowest cost per bit for many applications***. Our portfolio of proprietary technologies and design techniques allow us to use cost-effective, current generation DRAM ICs and in some cases avoid additional costs from chip-stacking to significantly lower the cost of our memory subsystems. Additionally, the superior thermal characteristics and electronic signal integrity of our subsystems helps OEMs reduce costs through simplified system design. [Emphasis added.]

27.    To achieve these stated goals, the Prospectus also reported that the Company maintained significant controls and procedures so as to assure strict compliance to its internal guidelines for accounting, financial reporting and forecasting - - including its use of estimates.  As evidence of this, the Prospectus stated, in part, the following:

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of the assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period....

28.    In Netlist's case, defendants' assessment and control over financial reporting and forecasting was especially important because, prior to the IPO, defendants had replaced the Company's independent auditors.  While defendants revealed this change, they also stated that this

change of auditors was *not* the result of any disagreement among the parties, and it did *not* reflect any weakness in the Company's controls or procedures. Accordingly, in this regard the Prospectus stated, in part, the following:

### Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

In December 2005, we dismissed Deloitte & Touche LLP as our independent registered public accounting firm and engaged Corbin and Company, LLP as our independent registered public accounting firm. Our board of directors approved this change.

Prior to the dismissal, we did not consult with Corbin and Company, LLP regarding the application of accounting principles to a specific completed or contemplated transaction or any matter that was either the subject of a disagreement or a reportable event. We also did not consult with Corbin and Company, LLP regarding the type of audit opinion that might be rendered on our consolidated financial statements.

Deloitte & Touche LLP's report on our consolidated financial statements as of January 1, 2005, and for each of the two years in the period ended January 1, 2005, did not contain an adverse opinion or disclaimer of opinion, nor was it modified as to uncertainty, audit scope, or accounting principles. *There were no disagreements with Deloitte & Touche LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure.* [Emphasis added.]

29.    These statements, in combination with investors' reasonable belief that a proper due diligence investigation into the Company had *already* been conducted, led investors to believe that, at the time of the IPO, Netlist maintained *at least* the minimum controls and procedures necessary to operate the Company in a safe and efficient manner. As evidence of this, the Prospectus also stated that the Company's Critical Accounting Policies were purported to be in compliance with Generally Accepted Accounting Principles:

### Critical Accounting Policies

*The preparation of our consolidated financial statements in conformity with accounting principles generally accepted in the U.S. requires us to make estimates and assumptions* that affect the reported amounts of assets and liabilities and

17

disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of net sales and expenses during the reporting period.....*We base our estimates on our historical experience, knowledge of current conditions and our beliefs of what could occur in the future considering available information*....[Emphasis added.]

30.    In part to prevent Company insiders from immediately liquidating their holdings as soon as the Offering was completed, and thereby destabilizing the market for Company's shares, in connection with the November 2006 IPO the Netlist Offering Prospectus also contained a recitation of the Lock-Up Agreements between certain officers and directors and the Company that prevented them from selling any additional Netlist shares:

**Lock-up Agreements**

We and the selling stockholders, our executive officers and directors and substantially all of our other existing security holders have agreed, subject to limited exceptions, not to offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any of their shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock; or enter into any swap or other arrangement that transfers to another, in whole or in part, any economic consequences of ownership of our common stock (other than with respect to shares being sold by a selling stockholder in this offering) during the period ending 180 days after the date of this prospectus without the prior written consent of Thomas Weisel Partners LLC, on behalf of the underwriters. If (a) during the last 17 days of this 180-day period, we release earnings results or announce material news or a material event or (b) prior to the expiration of this 180-day period, we announce that we will release earnings results during the 15-day period following the last day of the 180-day period, then in either case the above restrictions will continue to apply until 18-days after the date of release of the earnings results or the announcement of the material news or material event, as applicable, unless Thomas Weisel Partners LLC waives, in writing, such extension. These restrictions apply to shares of our capital stock which are now owned or which are acquired after the date of this prospectus by the person executing the lock-up agreement, or over which that person later acquires the power of disposition.

31.    Following the Offering, on January 12, 2007, defendant Hong appeared at Needham's Ninth Annual Growth Conference, where he reiterated many of the same or similar statements as he

had made in connection with the November 2006 IPO.  In fact, to introduce his presentation, defendant Hong began by stating that *the information he was providing was "pretty much what we covered during the road show about a month ago."*  During this presentation defendant Hong stated, in part, the following:

> So, looking at why you would invest in Netlist -- we are a leader in high-performance memory. It's a very large market which is growing rapidly. It's a $4.4 billion market, which is the high-density memory market, which we define as 1 GB memory and above. We, in a short period of time, have built up quite a broad portfolio of IP, which we leverage to provide solutions to our end customers. We have strong relationships with our OEM customers -- like IBM, Dell, Hewlett-Packard. And *we believe that this is a highly scalable business model and we have just begun to tap the potential of the model. And we are experiencing rapid growth in both revenues and gross margins.*
>
>             *    *    *
>
> *So we are in the business of filling this performance gap*. We take the same commodity off-the-shelf DRAM's that are used to deliver memory into the PC space and *with the use of our IP board level and packaging IP, we then create high-performance memory subsystems, which we deliver into the server and workstation space.*  [Emphasis added.]

32.    In terms of distinguishing Netlist from traditional DRAM manufacturers, and to condition investors to believe that the Company was not primarily engaged in a commoditized business – subject to the extreme volatility that exists in such markets – defendant Hong also stated, in part, that:

> So, it's a very large market and you ask why is a company of our size -- why we could be successful in this market? Who would -- who was addressing this business all along? *The traditional supply base for both PC and server memory over the years has been the silicon manufacturers -- DRAM's, such as Samsungs, Microns and the Kimondas of the world*. They represent today our supply base. *But simply put, these guys have been slow to keep up in terms of the density migration*. So, for example 10 years ago, DRAM densities used to quadruple at a dye level -- at a chip level every couple of years. Now it's taking them probably five to six years to just double the density. *So when that happens that requires more packaging -- it forces the industry to cram more and more chips into a given space which then causes thermo-mechanical, electrical issues, which we are in the business of solving*. So

19

what used to be a pretty simple 3 to 8-chip, 9-chip, 18-chip modules, now we are having to create 36, 72 chip cards and boards, which are very elaborate. *So what we have depicted here is a performance gap between what the OEM server manufacturers require in terms of performance versus what the silicon manufacturers can deliver today.* [Emphasis added.]

33.    Further, defendant Hong also stated that Netlist was insulated from typical DRAM pricing volatility because the Company maintained close relationships with its customers as a result of its sales of proprietary Intellectual Property (IP), integrated into the design and manufacture of those customers' products, that gave the Company early access to its customers' sales and order requirements.  As evidence of this, defendant Hong stated, in part, the following:

And so, this is another slide on IBM and this *is an example of how we get in earlier on with IP then grow the business over time*. In '03 we started again the blade development with them. But before they can get us onto servers they wanted to see a track record of quality and delivery so they brought us in to support their ThinkPad platform in '04. At that point we became the first new memory suppliers that they had brought in, in six years. Then in '05 we started to deliver the VLP's in volume and that -- we recorded about $25 million in revenues. At the same time we started to diversify away -- diversify into other platforms, such as the medical tablet. We are working with the higher end systems. They're all mainframe where there is a lot of custom memory today. In '06 we were able to double the business and we plan to continue to grow this business at IBM. *So this is a kind of a road map of how we would like to -- we plan to grow our businesses at other leading OEMs, such as HP. You get in with IP on a particular high-end platform and then you start to establish* - - you establish your track record in terms of high-volume delivery on commodity high-volume products and then over time continue to diversify into the higher end systems. [Emphasis added.]

34.    Finally, and possibly most importantly, the guidance that was provided by defendant Hong – the same as was given previously, immediately prior to the IPO, and left uncorrected in the market – included, in part, the following:

In the bottom you see *the quarterly numbers steadily increase over the last six quarters*. And that is a result of adding new customers such as IBM, HP and Apple. And so, *we look forward to continuing this growth trend over the next year.*

This slide is looking at how we have been able to diversify our revenues, as I

20

mentioned. Until '04 we were really a one customer Company with Dell being the primary customer. We were supplying into, as we are today, still into their PowerEdge Server. Within Dell, we have been able to diversify now into notebooks as well as workstations and into their storage area. *So through the course of the last couple of years, we've diversified not only into other customers, but also within each individual account we've been able to diversify.*

You see here the addition of Apple and HP really starting in the second half of last year. Also, Gateway, Lenovo, Crucial, [Hanhai]. We expect a couple of these customers to become 10% customers through the course of this year -- by the end of this year.

Here, you see *our margin trend over the last seven quarters*. Both gross margins in the red on the top line and operating margins. The top line -- the gross margin increase the steady increase is really a function of a couple of things. One as we've been able to utilize more and more of our capacity through '05 with the decline in the Dell business, we've ran our facility less than optimally, which led to higher cost. And as the factory utilization increased, that led to higher -- lowering of our costs and increasing of our gross margins. *Also importantly, is the penetration into the higher margin applications through the course of the last year. The operating margin increase reflects the fact that this model is highly leverageable.* Once you start covering the FX overhead, a lot of the profit that is generated drops to the operating income line.

*     *     *

*This is our target financial model,* looking out two to three years. *We expect to again increase our gross profit with the penetration of the more higher margin type of applications.* [Emphasis added.]

35.     At or about the time of this presentation, defendant Needham also published an analyst report on Netlist, advising its customers to "BUY" Company shares, and issuing a near-term price target of $12.00 per share. According to media reports, Needham based its opinion on the fact that *the Company's unique designs would purportedly drive earnings from the fast growing niche-market for high-end memory modules*.

36.     Similarly, at or about the same time, defendant WR Hambrecht also issued a BUY rating on shares of the Company immediately prior to the Company's analyst presentation. WR

21

Hambrecht too published a $12.00 near-term price target.  Also according to reports, WR Hambrecht based its opinion on estimates that ***Netlist would post year-over-year revenue and earnings growth in 2007 of 30%-plus and 90%, respectively***.  Betsy Van Hees, analyst at WR Hambrecht, stated that Netlist was in the sweet-spot of technology and was poised to benefit from increasing demand for computer memory as Microsoft's new Windows Vista rolls out.

37.    The same day as the Needham conference, defendant Hong also appeared on *TheStreet.com* Internet Television, and granted a video interview that was re-broadcast continuously over the net.  During this interview, defendant Hong made additional statements that provided more insight into the representations made during the road-show presentations immediately prior to the offering.  These statements included, in part, the following:

* That the Company's IP differentiates it from competitors because Netlist is able to "pack a lot more memory into a given space."

* That Netlist should not get "lumped in" with ordinary chip manufacturers, because the Company is engaged in the "high-end memory sector," that  "has done much better than the overall chip sector in the last 9 months."

* That, despite a relatively "flat" demand in the semiconductor chip sector in 2006, "not enough chip capacity [exists] to fulfill the memory requirements of all the OEM's that are out there."  And Netlist is capitalizing on the good demand by chip manufacturers.

* Accordingly, at the time of the IPO: (i) Netlist was seeing continued strong demand for high-end memory; (ii) the high-end memory market was, therefore, more robust than the ordinary DRAM market; (iii) high-end memory products were in short supply; and (iv) while the "chip cycle" may be weak, the high-end memory cycle remained robust.

38.    In addition, during *TheStreet.com* TV interview, defendant Hong also commented on the Company's strong internal corporate governance and controls that were in place at the time of the November 2006 Offering and before.  According to defendant Hong, "We've been in business for 6

22

years…." "From the get go," we have had good "corporate governance" and a "Strong Board of Directors." Defendant Hong also stated that, "when we went public, we made sure things were in order, and things are just fine with us."

39.    On February 1, 2007, when defendants announced results for the fourth quarter and full year of 2006, Netlist reiterated guidance for 1Q:07.  In its release announcing these results, defendants stated:

**Outlook for the First Quarter of 2007**

For the first quarter of 2007, Netlist estimates net sales will be in the range of $40 to $42 million, and gross margin will be approximately the same as the fourth quarter of 2006. Fully diluted earnings per share for the *first quarter are estimated to be in the range of $0.07 to $0.08 per share*, including estimated stock-based compensation expense of $300,000. [Emphasis added.]

40.    During the conference call hosted by defendant Hong for investors and analysts, which followed the announcement of these results the Company's purported strong market position and forward guidance, it was reiterated that:

We believe our intellectual property, OEM systems expertise, high quality manufacturing, and operational flexibility position Netlist for growth and increasing profitability in our target markets.

To that end, the proceeds from our recently completed IPO, in which many of you participated, thank you very much, *provide us with the capital resources and financial strength to take advantage of opportunities we are addressing in those markets.*

\*    \*    \*

*The revenue growth we reported today, for full year 2006, was achieved by further diversification of our OEM customer base and greater penetration of high end customer platforms*, while our unique memory solutions are seen as a key enabler of overall system features and functionality for a range of end users and applications.

\*    \*    \*

23

*We feel we are well positioned in our highly competitive industry because the performance requirements of top tier OEM systems are calling for memory subsystems of ever higher density*, faster speed, smaller form factors, and cooler temperatures. *We believe there is a gap between what these OEMs need and what the industry in general is capable of supplying.*

\*     \*     \*

*We also believe these markets provide us the opportunity* to be incorporated into applications that have longer lifecycles and *higher margin profile than for example laptop and laptop memory.*

As a result, we believe our technological capabilities in such areas as proprietary circuit designs, innovative planar solutions and thermal management will have wide applications beyond our historic focus on the OEM server and high performance computing markets.

\*     \*     \*

In addition, *our strategy of engaging our customers at the earliest stages of product design has enabled us to provide maximum value to customers in solving their memory challenges, value that translates into deeper penetration into their respective product categories, additional revenue opportunities and ultimately higher profit.* [Emphasis added.]

41.     During this call, defendants also provided updated forward guidance for 1Q:07, in part, as follows:

Let me now take you through our outlook for the first quarter of 2007. We currently expect revenues for *the first quarter of 2007 to be in the range of 40 to $42 million with gross margin remaining approximately flat with the fourth quarter of 2006.*

*Fully diluted earnings per share are expected in the range of $0.07 to $0.08 per share*…. Estimated fully diluted shares for Q1 are $22 million. [Emphasis added.]

42.     When the Company filed its Form 10-K with the SEC, on or about February 28, 2007, it also stated that Netlist's controls and procedures continued to remain adequate and sufficient. As evidence of this, the 2006 Form 10-K stated, in part, the following:

**Item 9A.**          **Controls and Procedures**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

24

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, *we conducted an evaluation of our disclosure controls and procedures*, as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report. *Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of December 30, 2006*. [Emphasis added.]

*43.*     On February 27, 2007, Needham again issued a "BUY" rating on shares of the Company, stating that, "while investors are concerned about higher inventory and declining DRAM prices, the Company's strong pipeline of design wins should turn into incremental revenues and substantial growth in 2H07. NEED would buy the stock at current levels." Thereafter, on April 10, 2007, WR Hambrecht also reiterated its "BUY" rating on shares of Netlist stating that, *"checks suggest in-line Q1 results…"*

### The True Financial and Operational Condition of Netlist is Belatedly Disclosed

44.     On April 16, 2007, after the close of trading, Netlist shocked investors when defendants published a release announcing preliminary results for the first quarter, ended on March 31, 2007, that were well below guidance and below expectations sponsored and endorsed by the Company. According to the release published by defendants at that time, *earnings would miss targets by as much as 75%.* Explaining these disastrous results, which directly contradicted the positive statements made by defendants at the time of the IPO, defendant Hong stated, the following:

> *"Our operating results for the first quarter were adversely impacted by the oversupply of DRAM during the quarter which in turn affected the pricing and gross margin on some of the lower-ASP, high-volume products in our portfolio. We also experienced lower than expected volume of high-end products from two large customers due to reduced demand across those customers' server platforms into which our products are incorporated. Finally, our operating expenses increased* as we invested in our sales, marketing and engineering teams consistent

25

with our long-term strategy of expanding within current customers and into new markets.

"While we are disappointed in our estimated results for the first quarter, we remain committed to our long-term strategy of developing high-performance memory subsystems that offer a superior value proposition to our OEM customers and targeting new application markets," added Hong. [Emphasis added.]

45.     Despite defendant Hong's overly-optimistic statements regarding a return to projected levels of profitability in the near-term, it is obvious from the Company's revised projections for the following quarter too that the problems adversely impacting Netlist were severe and would continue to reduce earnings well below guidance in the future. As evidence of this, the revised 2Q:07 outlook included the following:

**Outlook for the Second Quarter of 2007**

Based on continued softness in the DRAM market, ramp up costs related to our new manufacturing facility in China and continued incremental investment in sales, marketing and R&D, Netlist estimates that *second quarter 2007 net sales will be in the range of $34 million to $36 million*, and gross margin will be in the range of 13 to 14 percent. Fully *diluted earnings per share for the second quarter are estimated to be in the range of breakeven to $0.02 per share*... [Emphasis added.]

This is *in contrast to analyst consensus earnings estimates of $0.10 per share and revenue estimates of $43.6 million for 2Q:07.*

46.     As investors realized after the publication of these shocking and belated adverse admissions, the true but undisclosed negative conditions that existed at the time of the November 2006 IPO and that continued to adversely impact the Company after that time include, in part, the following:

(a)     At the time of the IPO, Netlist had not adopted any unique strategy that was having any meaningful ability to protect the Company from the volatile market conditions existing in

26

the commoditized chip space, and the Company was exposed and vulnerable to these market conditions;

(b)    At the time of the IPO, as a result of increasing oversupply in the DRAM market, defendants also failed to reveal that deteriorating profit margins were also eroding, and forseeably would continue to erode, Netlist's margins;

(c)    At the time of the IPO, because of the Company's purported relationship with its major customers, the Company was *already* aware, or had recklessly or negligently disregarded, that demand for its proprietary products was already under pressure;

(d)    At the time of the IPO, Netlist was also suffering from control deficiencies that were preventing the Company from publishing true and accurate guidance and forecasts; and

(e)    At the time of the November 2006 Offering, defendants had *not* conducted an adequate due diligence investigation into Netlist which would have revealed many of the issues and which would most likely have prevented the sale of this Company's shares to shareholders through the public equity markets at that time, or at the inflated price at which these shares were originally sold.

47.    The following day, April 18, 2007, as shares of the Company resumed trading, Netlist share price declined over 30%, as an immediate reaction to the publication of these belated disclosures. As over 1.78 million shares traded that day, Netlist stock collapsed to a low of $4.21 per share, before closing at only $4.29 per share - - a decline of almost 40% from the IPO price of $7.00 per share, and a decline of almost 70% from the stock trading high of over $12.00 per share.

48.    In addition, contrary to defendants' statements that the DRAM oversupply was somehow an industry-wide problem that was impacting Netlist and its competitors, the chart below -

27

- comparing Netlist to the S&P500 and several of its competitors - - demonstrates that the decline in

Netlist shares was *not* evidenced in the industry at large:



**Netlist compared to: S&P500, Sandisk, Macronix Intl. and Smart Modular Tech**

## CAUSATION AND ECONOMIC LOSS

49.    In connection with the November 2006 Netlist IPO, defendants signed a materially

false and misleading Registration Statement, and filed with the SEC and made available to

shareholders a materially false and misleading Prospectus. These filings were essential in allowing

defendants to complete the Initial Public Offering of 7.1875 million Netlist shares and raise over

$50.3125 million, and to create a public market for trading in Company stock immediately thereafter.


50.    On April 17, 2007, after defendants' prior misrepresentations and illegal and improper

conduct was revealed and became apparent to investors, shares of Netlist declined precipitously –

evidence that the prior artificial inflation in the price of Company shares had abated.  As a result of their purchases of Netlist stock in connection with the IPO, including those who purchased shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

51.    By improperly characterizing the Company's business and prospects, the defendants presented a misleading image of Netlist's business and foreseeable future growth.  In the IPO Prospectus and Registration Statement and road-show presentations, *defendants repeatedly emphasized the ability of the Company to provide high-demand niche high-end memory products that were **not** subject to the same type of volatility that the commoditized, standard memory chip market was known to exhibit.*  These claims caused and maintained the artificial inflation in Netlist's stock at the time of the November 2006 IPO and thereafter, until the truth about the Company was ultimately revealed to investors.

52.    Defendants' false and materially misleading statements caused Netlist shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $7.00 per share, until such shares reached a record trading high of over $12.60 per share on January 16, 2007.

53.    On April 17, 2007, however, after defendants revealed that Netlist was being negatively impacted by the same general market conditions that were affecting others, and that defendants could not operate the Company according to plan, shares of the Company collapsed. Thus, defendants' belated disclosures had an immediate adverse impact on the price of Netlist securities.

54.    These belated revelations also evidenced defendants' prior misrepresentation of Netlist's business prospects by defendants' false statements.  As investors and the market ultimately

learned, the Company's prior business prospects had been overstated as had the Company's foreseeable results of operations. As this adverse information became known to investors, the prior artificial inflation was immediately eliminated from Netlist's share price, and shareholders were damaged as a result of this related share price decline.

55.    As a direct result of investors learning the truth about the Company, on April 17, 2007, Netlist's stock price collapsed to a record low of $4.22 per share, compared to a trading high of above $12.00 per share, a decline of almost 70%, on very heavy trading volume of over 1.78 million shares – almost ten times the number of shares traded the prior trading day. This dramatic share price decline eliminated much of the artificial inflation from Netlist's share price, causing real economic loss to investors who purchased this stock in, or in connection with, the Netlist IPO.

56.    In sum, as the truth about defendants' misrepresentations and illegal course of conduct became known to investors, and as the artificial inflation in the price of Netlist shares was reversed, plaintiff and the other members of the Class were damaged, suffering an economic loss of approximately $ 4.00 per share.

57.    The decline in Netlist's stock price following the revelation of defendants' belated disclosures on April 16, 2007, was a direct result of the nature and extent of defendants' misrepresentations and omissions contained in the IPO Prospectus, as they became known to investors and to the market. The timing and magnitude of Netlist' stock price decline the following day, when trading resumed, negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct. During the same period

in which Netlist' share price fell over 40% as a result of defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

58.     The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of defendants' prior misstatements and omissions being revealed

## CLASS ACTION ALLEGATIONS

59.     This is a class action on behalf of all persons who purchased Netlist shares, or traceable stock, pursuant to the November 2006 Registration Statement and Prospectus (the "Class"), excluding defendants.  Class members are so numerous that joinder of all is impracticable.

60.     Common questions of law and fact predominate, and include: (i) whether defendants violated the Securities Act; (ii) whether the Netlist IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent and appropriate measure of damages.

61.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against
### All Defendants and §15 of the Securities Act Against Defendants

62.     Plaintiff incorporates each and every allegation above as if stated herein.

63.    The Individual Defendants each signed Netlist's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors. The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

64.    On or about November 30, 2006, the defendants named in this Claim for Relief completed an IPO of 7.1875 million shares of Netlist stock - - including the 937,500 shares sold by Company insiders and allotted to Underwriters in an oversubscription option - - at $7.00 per share, for total proceeds of at least $50.3125 million.

65.    Each of the statements alleged herein relating to Netlist's prospects and financial results made in the November 2006 Prospectus and Registration Statement were false or misleading when issued. The true but concealed facts were that Netlist was *not* able to execute a unique business strategy whereby sales of niche-market high-end memory could negate or offset the general volatility of the commodity market for DRAM, and that this foreseeable issue would continue to hinder the Company in the near-term. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.

66.    All defendants named in this Claim for Relief, with the exception of Netlist, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission of material facts required to be stated to make the statements contained therein not misleading.

67.    The officers and directors of Netlist who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement.  By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

68.    By reason of the conduct alleged herein, each defendant named in this Claim for Relief violated §11 of the Securities Act.  Defendant Hong and the other members of the Company's Board of Directors, by reason of their stock ownership and positions with Netlist, were controlling persons of Netlist and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May __11__, 2007

Michael A. Swick (MS-9970)
Kim E. Miller (KM-6996)
**KAHN GAUTHIER SWICK, LLC**
12 East 41th Street – 12 Floor
New York, NY  10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

- and -

33

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Attorneys for Plaintiff & the Class**

**CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF**

___THU TRAN___ (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.    Plaintiff did not purchase securities of Netlist, Inc. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period, plaintiff has executed transactions in the securities of Netlist, Inc. as follows. See Attached Schedule.

5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: __04/25__, 2007

_____
Plaintiff

## Netlist, Inc.    Thu Tran Transactions

| Date Purchased | Units | Unit Price |
|---|---|---|
| 1/30/2007 | 10000 | 9.29 |
| 2/7/2007 | 148 | 9.05 |
| 2/9/2007 | 1000 | 8.61 |
| 2/9/2007 | 900 | 8.58 |
| 2/9/2007 | 1000 | 8.55 |
| 2/9/2007 | 1952 | 8.53 |
| 2/15/2007 | 3000 | 8.35 |
| 3/2/2007 | 2000 | 8.26 |
| 1/30/2007 | 2000 | 9.30 |
| 2/7/2007 | 300 | 9.15 |
| 2/7/2007 | 700 | 9.15 |
| 2/27/2007 | 3000 | 8.25 |
| 3/1/2007 | 2000 | 8.56 |
| 3/2/2007 | 1000 | 8.28 |
| 3/14/2007 | 1000 | 7.31 |
| 2/1/2007 | 1000 | 9.83 |
| 2/2/2007 | 200 | 9.25 |

| Date Sold | Units | Unit Price |
|---|---|---|
| 4/18/2007 | 10000 | 4.31 |
| 4/18/2007 | 21200 | 4.32 |